# In The Matter Of:

*Crystal Brown VS*
*Cook County*

*Saran Crayton*
*April 5, 2019*

*ADVANTAGE REPORTING SERVICE*
*110 S.W. JEFFERSON AVE., SUITE 430*
*PEORIA, IL  61602*
*PHONE: 309-673-1881  FAX: 309-673-0341*
*reportingservice@att.net*

Original File 4-5-19_CRAYTON_VERLA.txt
**Min-U-Script® with Word Index**

59

1  Q. In the two years prior to the lawsuit being
2  filed?
3  A. Yes. To the best of my knowledge, yes.
4  Q. Can you tell me, to the best of your
5  recollection, the first time that were you subjected to
6  such an incident?
7  A. To the best of my recollection, I cannot
8  advise you as to the exact first time.
9  Q. Well, if the lawsuit was piled in the fall of
10 2017 and these attacks occurred within two years, we're
11 talking about 2016 -- I'm sorry, 2015 to 2017. Would
12 that be accurate?
13        MS. BOLANOS: I'm just going to object to the
14 extent that misstates the testimony. If you're talking
15 about the statute of limitations which is two years
16 that's one thing. If you're asking when the attacks
17 started, that's another thing. I'm a little confused.
18 BY MR. BERSANI:
19 Q. Do you understand my question?
20 A. I would also be concerned as to exactly what
21 time period are you referring to.
22 Q. I had asked you whether these incidents
23 occurred -- that you were directly subjected to occurred
24 within two years of the lawsuit being filed, and you

60

1  said yes. So I'm just trying to get a little bit more
2  specificity for when they started for you personally.
3      A.  They started for me personally once I was in
4  Judge Howard's courtroom, assigned to Judge Howard's
5  courtroom, is when I first experienced them.
6      Q.  And I think earlier you said you were in Judge
7  Howard's courtroom starting in 2015?
8          MS. BOLANOS:  Objection to the extent it
9  misstates testimony.
10         THE WITNESS:  To the best of my recollection,
11 that may have been it, but without my employment records
12 or calendars, I couldn't tell you a specific time.
13 BY MR. BERSANI:
14     Q.  So can you tell me this -- and I guess this
15 would be an estimation or approximation on your part,
16 but how many times have you been subjected personally to
17 these incidents in that two-year period?
18         MS. BOLANOS:  Objection to the extent it calls
19 for speculation.
20         THE WITNESS:  I would have to speculate that
21 it was several hundreds of times.  There are times you
22 go back in lockup and depending on how many people are
23 on the call that day, you may go back into that lockup
24 five, six, seven times, and depending who was in there,

1  there could be multiple detainees in there with their
2  penises out and masturbating actively at you, leering at
3  you while you're trying to do your job, while you're
4  trying to talk to your clients.  They line up sometimes
5  to make sure that you could not avoid their contact.
6  They would position themselves right in the line of
7  sight of your client.
8           When you walk in, you have to tell them
9  or I made it almost always to say whenever I saw someone
10 with their dicks out, put that -- put your dick away, I
11 don't want to see it, loudly or even put your little
12 dick away, almost every single day when it was
13 happening.
14 BY MR. BERSANI:
15     Q.   So would it be fair to say that these
16 instances occurred to you -- strike that.  Sometimes
17 these instances occurred to you multiple times in a
18 single day is what you're saying?
19     A.   Yes.
20     Q.   Both in the lockups at 26th and California in
21 Judge Howard's courtroom and at the jail?
22     A.   Yes. And sometimes even in Judge Howard's
23 courtroom there would be a -- in 203 there is a lockup
24 right next to her courtroom.  There would also sometimes

63

1 the injunction.

2     Q. You wouldn't use the word rare?

3     A. No.

4     Q. Do you recall the last time that you were
5 personally subjected to such an incident either in the
6 lockup or at the jail?

7     A. Specifically I cannot recall the exact last
8 time. There's several events that are seared in my mind
9 of the masturbation attacks I will call them. Putting a
10 date to the very last time I could not, but it was prior
11 to the injunctive relief.

12     Q. So for the record, Ms. Crayton, I've handed
13 you what we've marked as Exhibit 230. This is a group
14 of documents. The first page for the record is CCPD
15 7837. The next page is Brown 90444, Brown 90408, CCSO
16 89816, CCSO 89817, CCSO 90345, 90346, Brown 112341,
17 112342 through 112344.

18     So these are a group of documents. I
19 know there's a lot here, but I will try and shortcut
20 this a little bit here. I will give you as much time as
21 you need to look through these. My understanding is
22 that there was an incident that occurred on October 3,
23 2017 in which a detainee exposed himself to you in the
24 lockup behind Courtroom 500 or 502. Is that your

64

1 recollection?
2     A.    That is from looking at this document, yes.
3     Q.    And was this detainee your client?
4     A.    No, he was not.
5     MR. BERSANI:  Off the record for a second.
6     (Discussion off the record)
7     MR. BERSANI:  So the identity of the inmates
8 we will make that attorneys' eyes only?
9     MS. BOLANOS:  Correct.
10     MR. BERSANI:  So attorneys' eyes only at this
11 point.
12 BY MR. BERSANI:
13     Q.    So the inmate in question here was D.L.
15     A.    Yes.
16     Q.    So when I refer to the inmate or DL, that's
17 who I'm referring to, okay, from this point on?
18     A.    Okay.
19     Q.    Ms. Crayton, first of all, I guess do you need
20 time to look at these documents before I ask you
21 questions about this incident?
22     A.    Yes.  I'm not familiar with them.
23     Q.    Sure.  Take your time.
24     A.    Okay.

65

1          MR. BERSANI:  For the record, while you're
2     looking at this, this group of documents identify some
3     names of inmates, so I guess we will make that document
4     attorneys' eyes only for the time being.
5          MS. BOLANOS:  I didn't produce it, so I don't
6     know.  So, yes.
7          THE WITNESS:  I'm ready.
8     BY MR. BERSANI:
9        Q.   Do you remember this incident involving this
10    inmate?
11       A.   I do.
12       Q.   Could you tell us what happened, please?
13       A.   I was in assigned to Judge Wadas' courtroom on
14    this particular day.  I had of course several clients up
15    on that day.  I was trying to convey offers as I do
16    every day with two of my clients in lockup.  In 502 the
17    bullpen is approximately 30 to 40 feet from the
18    courtroom door.  I had been advised -- I believe I had
19    been advised by the courtroom sheriff that there was a
20    group that was trouble, I believe was the word that was
21    used.
22                When I went back there, there was one
23    detainee in particular that had his penis exposed and
24    was vigorously masturbating.  Generally when you walk

1 back there, you try to walk in with your head down, but
2 once you get to the bullpen, I saw out of the corner of
3 my eyes that he was going at it.  I told him to stop,
4 put it away, put your little dick away, and left out.
5             When I returned later into the lockup,
6 he was continuing to do it, and he was right -- the 502
7 lockup there is a bathroom portion.  In the corner you
8 could see there is a video camera or camera there, and
9 he had positioned himself in between the stall where you
10 could still see him but specifically in my line of sight
11 when I was talking to my client.  Generally you try to
12 move over to the right or to the left.  Then they will
13 move too and then they will sit -- or stand and
14 masturbate and leer at you, trying to get your
15 attention.
16             Again, I told him to put -- I may have
17 used the words put your little dick away, I don't want
18 to see that.  At my best recollection he used some
19 expletive, called me a bitch and you know that you like
20 it, and it got a little loud.  Best of my recollection
21 Sheriff Ron told me just to leave.
22     Q.    Sheriff Ron?
23     A.    Johnson.
24     Q.    Ron Johnson, okay.

67

1     A.   I was upset and told him -- he asked me on
2 that day if I wished to sign a complaint. I told him
3 yes, I did at that time because I knew that this client
4 was not represented by the Public Defender. I also
5 informed his private attorney his what his client was
6 doing, and I went to see if I could find his mother to
7 inform her what he was doing.
8     Q.   Did you find his mother?
9     A.   She had left before I could contact her.
10     Q.   What did his private attorney say to you, if
11 anything, in response to you telling him what you
12 observed?
13     A.   He rolled his eyes and shrugged and just said
14 okay and walked back there.
15     Q.   And that private attorney obviously was not a
16 public defender, correct?
17     A.   No.
18     Q.   Anything else in that incident that you recall
19 that you haven't covered already?
20     A.   Not that I recall specifically.
21     Q.   So you said Ron Johnson was the courtroom
22 deputy?
23     A.   I believe Ron Johnson and Laura Pitts were
24 the -- generally assigned to that courtroom at that

68

1   time.
2       Q.   P-I-T-T-S?
3       A.   Yes.
4       Q.   Were either one of them back in the lockup
5   when this occurred with this inmate?
6            MS. BOLANOS:  Objection, asked and answered.
7            THE WITNESS:  During the time when it became
8   loud, I know Ron Johnson was back there and told me just
9   to leave.
10  BY MR. BERSANI:
11      Q.   Was it your impression that Ron saw what was
12  going on?
13      A.   It's my impression that he either saw it or
14  that he heard and knew based on my reaction and my
15  conversation yelling at the detainee.
16      Q.   And so you filed a complaint with the deputy
17  sheriff, with Ron Johnson?
18      A.   I believe -- yes, I believe.  I don't know if
19  Mr. Johnson actually took it.  I do recall that he had
20  called someone to come in to fill out the complaint.
21      Q.   And was this a verbal complaint on your part
22  letting the deputy sheriff know, or did you put
23  something in writing to the sheriff about the incident?
24           MS. BOLANOS:  Objection to form.

1          THE WITNESS:  I see that on there.
2     BY MR. BERSANI:
3          Q.   Is this the first time you've seen these
4     documents?
5          A.   It absolutely is.
6          Q.   And have you ever been advised by the
7     Sheriff's Office that the incident that you reported
8     involving this inmate was investigated and written up
9     and the inmate was disciplined?
10              MS. BOLANOS:  Objection, assumes facts not in
11    evidence.
12    BY MR. BERSANI:
13         Q.   I'm asking if you've ever been advised of
14    that.
15         A.   No one followed up with me.  No one advised me
16    as to anything.  No one asked me for my input as to
17    anything.
18         Q.   So this is the first time -- I'm sorry, did
19    you finish your answer?
20         A.   Other than the day that I verbally reported it
21    to the sheriff, there has been absolutely no follow-up
22    as to the outcome.
23         Q.   So today is the first you're hearing of that?
24              MS. BOLANOS:  Objection to the extent it

102

1       MS. BOLANOS: Same objection.
2       THE WITNESS: First of all, the Public
3 Defender herself could have picked up a file, came down
4 to the felony trial division, walked in that lockup and
5 experienced what her female APDs were continuously
6 complaining about what was happening on almost a daily
7 basis. She could have came down and experienced that
8 for herself. I've never once seen her down there to
9 experience it. The only time I've ever seen her down
10 there was when she was apologizing, not to the female
11 APDs but to the detainees for being handcuffed. I've
12 never seen her come down there and subject herself to
13 that environment. That's the first thing she could have
14 done.
15       The second she could --
16 BY MR. BERSANI:
17   Q. Before you get to number two, let me ask you
18 this. The time that she was in lockup and you say she
19 apologized, were you present for that?
20   A. I was present.
21   Q. And you heard her?
22   A. I saw her. I heard her. I was within six
23 inches of her.
24   Q. And when did that happen?

1      A.   That happened in 2017.  To the best of my
2  recollection, it was the early part of 2017.  I was in
3  the lockup -- back of the lockup of Howard's courtroom
4  having conversation with a client who I had just
5  finished a case and I was communicating to him about the
6  case.  Ms. Campanelli came up to me, said excuse me.  At
7  that time every defendant in the bullpen was handcuffed.
8  Ms. Campanelli said excuse me, and she -- I had to move
9  to the side because it's just a door for her to talk, it
10 was limited space, so that she could communicate to the
11 detainees there.
12              To the best of my recollection,
13 Ms. Campanelli apologized to the detainees saying that
14 she was sorry that they were being handcuffed or that
15 they were handcuffed and that it was going to be a
16 temporary measure, that it was because there were a few
17 of -- there were a few people causing disturbances with
18 exposures or what have you, but this was basically going
19 to be a temporary thing.  That I recall vividly.
20     Q.   Is it your belief that Amy Campanelli was
21 opposed to all inmates being handcuffed in the lockups,
22 or did she -- is that your belief, that all inmates, no
23 matter whether they have a history of exposure incidents
24 or not?

251

1  they would have -- they would be looking down at you
2  with their dicks out saying lewd things to you and
3  masturbating as you were walking into Division 9.
4      Q.   Did you experience indecent exposure or
5  masturbation in any other location in Division 9 beside
6  when you would walk into Division 9?
7      A.   Also when you were visiting a client in the
8  rooms there would have been clients that -- not clients,
9  detainees that would walk by.  Some of them would have
10 their penises exposed.
11     Q.   That's when you were in the meeting rooms?
12     A.   Yes.  You could see the outside.
13     Q.   So besides when you were in the meeting rooms
14 and when you were walking into Division 9, were there
15 any other areas in Division 9 where you were exposed to
16 indecent exposure or masturbation?
17     A.   No.
18     Q.   What about in Division 10, where were you
19 exposed to this conduct?
20     A.   In the meeting rooms at Division 10.
21     Q.   Are there any other locations in Division 10
22 that you were exposed to this conduct?
23     A.   No.  To be clear so the record is clear, when
24 I say in the meeting room, Division 10 would be -- you

Saran Crayton - April 5, 2019
Crystal Brown VS Cook County

252

1  would have to be escorted into the meeting rooms on the
2  tier and you would be locked in that room on the tier
3  with your client.  You would have to wait for the
4  sheriff to bring your client there shackled.  In between
5  the meeting room and the sheriff's station there would
6  be a hallway, and the other side of the sheriff's
7  station there -- of course both the sheriff's station
8  and your client meeting room would be a glass where you
9  could see through.  And outside the sheriff had
10 positioned a microwave for the detainees to use.  So
11 detainees, it's my understanding, seemed to have free
12 flow to go in and use that microwave.
13            On one particular occasion I recall
14 being there with my client in lockup and there would be
15 -- there were some detainees that kept walking by with
16 his penis out while the sheriff was on the other side
17 not paying attention and consistently masturbating and
18 leering at me while I'm trying to have my discussion
19 with my client and I'm facing the wall.  He kept at it
20 and he ejaculated on the glass.  I had to bang on the
21 glass to get the sheriff from the other side who was not
22 paying attention to get him out of the hallway.
23      Q.   Do you know when that occurred?
24      A.   I do not recall the exact date.

1    Q.   Do you recall the year?
2    A.   I believe it was in 2017.
3    Q.   Do you recall the month?
4    A.   I do not.
5    Q.   Do you know the detainee that engaged in this
6  conduct?
7    A.   I do not.  It was not a client of mine.
8    Q.   Do you know the sheriff that you had to bang
9  on the window to get his attention?
10   A.   No, I do not know him personally.
11   Q.   Did you tell any sheriff's officer about this
12 incident?
13   A.   The sheriff that I had to bang to get him, yes
14 that would -- that one I did.
15   Q.   Did you ask that sheriff if you could file a
16 written complaint about this incident?
17   A.   Not at that time.  No, I did not.  I would
18 assume since he knew what happened and the evidence was
19 right there on the glass that there must have been some
20 internal procedure for that sheriff to file a complaint.
21 Whether that sheriff did I do not know.
22   Q.   Did you ask him to file an internal complaint?
23   A.   No, because at that time I was meeting with my
24 client and I was trying to finish that -- my visit with