**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CRYSTAL BROWN, SARAN CRAYTON, SAMANTHAN SLONIM, CELESTE ADDYMAN, ERIKA KNIERIM, and JULIE HULL, on behalf of themselves and a class of similarly situated persons,** ) ) ) ) ) ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Case No. 17 C 8085** |
| ) | |
| **COOK COUNTY, AMY CAMPANELLI, in her official and individual capacity as Public Defender of Cook County, and THOMAS DART, in his official and individual capacity as Sheriff of Cook County,** ) ) ) ) ) ) ) | |
| ) | |
| **Defendants.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this putative class action have sued Cook County, Cook County Public Defender Amy Campanelli, and Cook County Sheriff Thomas Dart alleging employment discrimination under Title VII, the Equal Protection Clause of the Fourteenth Amendment, and parallel provisions of state law. The named plaintiffs are women who serve or have served as assistant public defenders for the county and who contend that the defendants created a hostile work environment for women they employed. They also allege that one of the defendants, Campanelli, retaliated when the plaintiffs sought redress. The plaintiffs have moved for certification of a hostile work environment class and for certification of a retaliation subclass. For the reasons below,

the Court grants the motion to certify the hostile work environment class as modified below but declines to certify the retaliation subclass.

## Background

The named plaintiffs—Crystal Brown, Saran Crayton, Samantha Slonim, Celeste Addyman, Erika Knierim, and Julie Hull—were at all relevant times assistant public defenders for Cook County.[1]  In their roles, the plaintiffs worked directly for Cook County Public Defender Amy Campanelli and Cook County.  They contend that they were also indirect or joint employees of Sheriff Dart, who administers the Cook County Jail.

The Cook County Jail system is sprawling.  The main complex, located south of 26th Street and (mostly) west of California Avenue in Chicago, is divided into a number of divisions.  The events underlying this case occurred primarily (but not exclusively) in divisions 9 and 10 of the jail, which house maximum security detainees, as well as the lockups at the George N. Leighton Criminal Courthouse.

The Cook County Public Defender program is also extensive.  There are sixteen practice groups, also called divisions, to which assistant public defenders are assigned.  Only defenders assigned to two of these divisions—Felony Trial and the Homicide Task Force—work primarily in the Leighton Courthouse.  All of the plaintiffs identified in the briefs except Julie Willis work or have worked in the Felony Trial Division.  (Willis worked at the courthouse in suburban Markham, Illinois.)  But, relevant later, the

_____

[1] The plaintiffs highlight testimony from eleven other individual plaintiffs in their brief: Rachelle Hatcher, Brett Gallaher, Rocio Armindariz, Kyan Keenan, Takenya Nixon, Carly Patzke, Stephanie Schlegel, Ashley Shambley, Coryn Steinfeld, Niyati Thakur, and Julie Willis.  But the plaintiffs expressly propose only Brown, Crayton, Slonim, Addyman, Knierim, and Hull as class representatives.  *See* Pls.' Br. in Supp. of Mot. for Class Cert., dkt. no. 203, at 4 n.1.

plaintiffs allege that all members of the putative class are required to get experience in the Felony Trial Division to be eligible for promotions, meaning that they have to spend time working at the Leighton Courthouse and meeting with clients at the jail.

## A. Attacks underlying this suit

Each plaintiff alleges that she was subjected to a hostile work environment stemming from exhibitionist attacks perpetrated by detainees at the jail and various courtroom lockups. Indeed, it is undisputed that between 2015 and 2017, attacks involving indecent exposure and masturbation by detainees became frequent. Although each attack was different, a common theme emerged: detainees targeted women assistant public defenders and law clerks for attacks that involved exposing their penises and masturbating while making eye contact with or otherwise directing their conduct toward their target. These attacks were commonly accompanied by verbal threats and, occasionally, physical contact.

The plaintiffs contend that the attacks were organized by a group of detainees who specifically sought to target women who worked in the jails. They point to testimony about a prison gang called "Savage Life" that was formed in 2015 and which allegedly orchestrated the attacks on jail personnel. The plaintiffs contend that the gang organized a sort of competition in which detainees were awarded points for attacks; incidents involving assistant public defenders and law clerks were apparently worth more points than attacks on other jail personnel.

The plaintiffs further assert that the defendants were aware of the severity and widespread nature of the attacks by, at the very latest, January 2016 when a *Chicago Sun-Times* article about them was published. The defendants do not meaningfully

contest this timeline and even suggest they were aware of (and sought to address) the problem as early as October 2015. Moreover, there is significant evidence that the defendants agreed that the conditions women who worked in the jail faced were quite severe, with Campanelli herself characterizing the attacks as an "epidemic." Pls.' Br. in Supp. of Class Cert. (Pls.' Br.), Ex. M, dkt. no. 202-25, and her chief of staff, Lester Finkle, describing the situation as a "[p]ublic indecency crisis," *id.*, Ex. O, dkt. no. 202-27.

According the limited data available, the attacks most often occurred in divisions 9 and 10 of the jail and in the Leighton Courthouse's lockups. As discussed below, however, the plaintiffs contend that these data are incomplete because victims were discouraged from reporting. And, as plaintiffs point out, attacks also occurred in other divisions of the jail and various courthouse lockup locations throughout the county.

## B.    Responsive measures

The plaintiffs contend that the defendants' response to the widespread attacks was inadequate. Specifically, they point to several policies and practices that they say the defendants adopted that did not sufficiently address—and in some cases perhaps even exacerbated—the attacks. At the outset, the plaintiffs point to evidence that in late 2014 the Cook County Sheriff's Office revised its Disciplinary Charges Code to lower the offense classification for indecent exposure, masturbation, and sexual harassment offenses. The downward adjustment took these offenses from the second highest level, category 6, to the second lowest level, category 2. The plaintiffs suggest that this change may have played a role in the dramatic increase in exhibitionist attacks in the following months.

Second, in October 2015, after the initial spike in attacks, the sheriff's office installed signs advising detainees of the consequences for multiple indecent exposure offenses. These signs noted that a detainee convicted of three such offenses would be required to register as a sex offender. These measures had very little effect. The plaintiffs suggest that this was, at least in part, because the procedure for prosecuting inmates was an ineffective disincentive. Prosecutions were often delayed, and when they did occur, prosecutions sometimes involved transporting inmates to outlying facilities, an aspect of the process that the plaintiffs contend may have actually incentivized attacks for detainees who wanted to travel outside of the jail.

Next, beginning in January 2016, the Public Defender sent supervisors to the jail to hold classes with detainees about the consequences of masturbation attacks and to encourage the detainees to stop the onslaught. The plaintiffs contend that this measure was wholly ineffective and was followed by a further increase in the rate of masturbation attacks. Also in January 2016, the sheriff's office's chief of staff Michael Curry was informed that a policy intended to help monitor detainees who had been found guilty of the sort of exhibitionist attacks at issue here was not being effectively administered. Specifically, Curry learned on January 25 that eighty-six detainees who had been found guilty of public indecency had not been issued the distinctive pink identification cards the jail used to identify violators. The plaintiffs suggest that this failure was evidence of a broader trend of ineffective and lax enforcement.

In June 2016, an assistant executive director of the Cook County Sheriff's Office and other members of the jail staff threw a group of maximum security detainees a pizza party. The purpose of the party was, according to the plaintiffs, to reward

detainees who had previously been convicted of masturbation-related offenses for going a period of time without perpetrating additional attacks. The plaintiffs contend that this incentivized detainees who had not previously perpetrated attacks against prison personnel to join in the harassment in order to become eligible for such a reward. But the evidence cited makes clear that this party was unauthorized and was, in fact, against jail policy; it was neither funded by the sheriff's office nor endorsed by it.

A few months later, in October 2016, the sheriff's office instituted a larger change: it began requiring detainees who engaged in indecent exposure to wear modified uniforms that ostensibly restricted their ability to expose their genitals. These uniforms were also distinctive in that they were green, a different color from the other uniforms at the jail. The plaintiffs contend, however, that this measure was ineffective. First, that say that the green jumpsuits did not fully restrict detainees' ability to expose themselves. Second, they contend that the jumpsuit policy was not uniformly enforced and that some violators were overlooked—just as had occurred with the pink ID card policy. Third, the plaintiffs say that the sheriff's office failed to effectively monitor the inmates who were required to wear the green jumpsuits. As a result, they contend, many offenders were allowed to commit repeat attacks against jail personnel.

The only measure that was truly effective, the plaintiffs assert, was handcuffing. In February 2017, the sheriff's office began shackling all detainees while they were in courthouse lockups. Plaintiffs say that this had an immediate impact; detainees whose hands were cuffed behind their backs could not masturbate or otherwise expose themselves to assistant public defenders or law clerks. But this measure lasted only a short time, as the policy was rescinded at the end of February. The plaintiffs emphasize

that, although Sheriff Dart emphatically supported continued cuffing, Campanelli opposed the practice. Indeed, they point to testimony from multiple class members that Campanelli actually apologized to detainees who had been handcuffed. According to one plaintiff, Campanelli told detainees that they were being handcuffed because "a few [detainees were] causing disturbances with exposures." Pls.' Br., Ex. 3 (Crayton Dep.), dkt. no. 202-3, at 103:17-18. Another plaintiff testified that she heard Campanelli tell detainees that "they were being handcuffed because of the masturbation issues and . . . [complaints by] female public defenders specifically." *Id.*, Ex. 9 (Gallagher Dep.), dkt. no. 202-9, at 183:1-3. The plaintiffs say that Campanelli unfairly characterized the cuffing as the plaintiffs' fault, opening them to further attacks.

The other measure implemented in February 2017 was a staffing surge. Sheriff Dart placed additional deputies on certain floors of the Leighton Courthouse. The plaintiffs say that this measure was only partially effective because additional deputies were not assigned to some of the floors on which attacks continued and because even where additional deputies were assigned, they were not always present and attentive. And any potential benefit was fleeting because the additional deputies were removed in August 2017 due to budget cuts.

The plaintiffs also note that Campanelli opposed a bill introduced in the state legislature that would have increased criminal penalties for indecent exposure. They concede that Sheriff Dart supported the legislation but suggest that Campanelli's opposition indicates that she discounted the severity of the conditions facing her employees. They suggest that "[i]t is possible that the legislation would have reduced attacks." Pls.' Br., dkt. no. 202, at 19.

In October 2017, Campanelli convened a meeting of assistant public defenders from the Felony Trial Division. According to multiple people in attendance at that meeting, she told all assembled that she could not protect them while they were in the lockups or jail. Rather, according to Campanelli, it was Sheriff Dart's responsibility to keep them safe while they were in the jail complex. The plaintiffs suggest that this effort to shift blame to the Sheriff Dart alone is unsupported by the record. They specifically note that the county has substantial authority to invest in infrastructure and other measures that could reduce the frequency of attacks.

In any event, the parties appear to agree that the attacks abated in November 2017. The parties disagree about whether this abatement was a result of changes identified by the defendants or whether it was caused by the two agreed preliminary injunctions entered by this Court, which mandated additional procedures designed to prevent attacks on women working in the jail.

**C.    Culture of silence and retaliation**

Beyond their allegations about the ineffective and sometimes counterproductive nature of the defendants' efforts to prevent attacks, the plaintiffs also allege that they were pressured not to report harassment. They say that there was a de facto policy against reporting clients at all but particularly against pressing criminal charges. In other words, the plaintiffs say that they felt that the public defender program had a culture in which victims of the sorts of exhibitionist attacks they endured were expected to simply turn the other cheek. *See, e.g.*, Pls.' Br., Ex. 1 (Stahl Dep.), dkt. no. 202-1, at 110:7-9 ("[T]here's a feeling that, you know, we as public defenders shouldn't be filing charges against our own clients."). Multiple plaintiffs testified about a specific example

involving putative class member Ashley Shambley.  After being subjected to a masturbation attack by a detainee in 2016, Shambley pressed criminal charges.  The plaintiffs allege, citing deposition testimony, that Shambley was criticized by senior assistant public defenders for filing the charges.  They contend that those senior attorneys suggested that Shambley had invited the attack by wearing certain clothing and that they spread rumors about her performance and abilities as a lawyer.

The plaintiffs contend this hostility to reporting went all the way to the top.   They point to statements from Campanelli and her chief of staff, Finkle, suggesting that some people simply "shrug off" these sorts of attacks.  The plaintiffs took these statements to suggest that the most senior officials in the office wanted them to simply endure the regular harassment to which they were subjected.  They suggest that Sheriff Dart also encouraged silence by failing to create an administrative reporting procedure for these sorts of attacks until March 2017, long after the attacks surged.

The defendants, for their part, firmly dispute the plaintiffs' characterizations.  First, they point to communications between Campanelli, Finkle, and their subordinate assistant public defenders in which they affirmed their support for defenders' rights to report harassment and even to file criminal charges.  *See, e.g.*, Pls.' Br., Ex. BBBB, dkt. no. 202-81.  The defendants also note—and the plaintiffs acknowledge—that Sheriff Dart repeatedly encouraged all who experienced masturbation attacks to press charges. *See, e.g.*, *id.* Ex. R, dkt. no. 202-29, at 2.  Indeed, they point to evidence that Dart exhorted Campanelli to require her employees to report.

Finally, the plaintiffs also allege that the culture of silence ultimately set the stage for discriminatory retaliation against those who dared to speak.  In October 2017, about

9

two years after the defendants' initial efforts to address the attacks, seventeen of the plaintiffs filed a complaint with the EEOC. They alleged a gender-based hostile work environment stemming from the masturbation attacks and the defendants' ineffective efforts to counter them. On October 31, shortly after the filing of the EEOC complaint, the defendants enacted a temporary ban on assistant public defenders entering lockups at the Leighton Courthouse. This ban, on its face, applied to all public defenders regardless of gender. But the plaintiffs say that it was instituted in retribution for the EEOC complaint. They suggest that because Campanelli knew about the EEOC complaint before instituting the ban, she likely understood the position she was putting the plaintiffs in by ordering them to stay out of the lockups. The plaintiffs also say that although men were permitted to ignore the ban, women were not. And despite explaining the directive, some of the female assistant public defenders were threatened by judges with various sanctions if they failed to enter the lockup to talk to their clients, including in at least one case a referral to the Attorney Registration and Discipline Commission. According to the plaintiffs, this was predictable and indeed planned by Campanelli—the "culmination of a campaign of retaliation and discouragement." Pls.' Br., dkt. no. 202, at 23.

**D.    This suit**

The plaintiffs filed this suit in November 2017. The four-count amended complaint alleges (1) a sex-based hostile work environment in violation of the Equal Protection Clause of the Fourteenth Amendment, via 42 U.S.C. § 1983, against Dart and Campanelli in their official capacities; (2) a sex-based hostile work environment in violation of Title VII, 42 U.S.C. § 2000e-2(a), against Dart and Campanelli in their official

capacities and against Cook County; (3) retaliation under Title VII, *id.* § 2000e-3(a),

against only Campanelli in her official capacity; and (4) violations of parallel provisions

of the Illinois Civil Rights Act against all three defendants.[2]  The plaintiffs also assert a

separate claim for indemnification against Cook County.

The plaintiffs now move to certify two classes under Rule 23 of the Federal Rules

of Civil Procedure.  First, they ask the Court to certify a hostile work environment class

comprising:

> All female APDs [assistant public defenders] (not including APDs
> supervisors) and law clerks who have worked for Defendants from
> November 1, 2015 through the present and who have visited or will be
> required to visit the jail and/or lockup in connection with their employment.

*See* Pls.' Br., dkt. no. 202, at 24.  They also seek certification for a retaliation subclass

of:

> All female APDs [assistant public defenders] (not including APD
> supervisors) who have worked for Defendants from November 1, 2015
> through the present in the Felony Trial Division or who filed charges,
> reports or made complaints about detainees masturbation or indecent
> exposure incidents.

*Id.*

## Discussion

Federal Rule of Civil Procedure 23 sets out the requirements for class

certification.  First, under Rule 23(a) a putative class must satisfy the requirements of

numerosity, typicality, commonality, and adequacy.  *See* Fed R. Civ. P. 23(a); *Wal-Mart*

*Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011).  Next, Rule 23(b)(3) permits class

---

[2] Because these claims involve questions of law parallel to the federal claims, they do
not warrant separate discussion.  *See Hoosier v. Greenwood Hospitality Mgmt. LLC*, 32
F. Supp. 3d 966, 975 (N.D. Ill. 2014); *Cent. Austin Neighborhood Ass'n v. City of
Chicago*, 2013 IL App (1st) 123041, ¶ 10, 1 N.E.3d 976, 980.

certification only if "questions of law or fact common to class members predominate over any questions affecting only individual members, and [ ] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594 (1997). At the certification stage, the Court does not "adjudicate that case," but rather "select[s] the method best suited to adjudication of the controversy fairly and efficiently." *Amgen v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013). "The party seeking certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 433 (7th Cir. 2015).

## A.    Hostile work environment class

The plaintiffs' hostile work environmental claims arise under Title VII and the Equal Protection Clause of the Fourteenth Amendment (via 42 U.S.C. § 1983). To prevail on their Title VII claims, the plaintiffs "must show that (1) [they were] subject to unwelcome harassment; (2) the harassment was based on [their sex]; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018). The constitutional claims have the same elements, with the added requirement that the plaintiffs show the defendants acted under color of law. *See Alamo v. Bliss*, 864 F.3d 541, 548 n.16 (7th Cir. 2017) ("When a plaintiff uses § 1983 as a parallel remedy to a Title VII hostile work environment claim, the elements needed to establish liability are the same under both statutes."); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S.

12

40, 49 (1999) (noting color of law requirement).

Importantly, and contrary to the defendants' repeated insinuations, an employer may be liable for a hostile work environment created by a third party. In *Erickson v. Wisconsin Department of Corrections*, 469 F.3d 600 (7th Cir. 2006), for instance, the Seventh Circuit held that "for purposes of Title VII hostile work environment liability based on negligence, whether the potential harasser is an employee, independent contractor, or even a customer is irrelevant." *Id.* at 605. Put another way, "[t]he genesis of inequality matters not; what does matter is how the employer handles the problem." *Id.* (quoting *Dunn v. Wash. Cty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005)). Where a hostile work environment is created by a third party—such as a person detained at a jail or prison—an employer may be "liable under Title VII's negligence standard if it failed to discover and prevent sexual harassment of an employee giving rise to a hostile work environment." *Id.* (internal quotation marks omitted).

The defendants challenge the plaintiffs' showings under Rules 23(a) and 23(b). First, although they concede numerosity, the defendants contend that the plaintiffs have failed to demonstrate commonality, typicality, and adequacy for their hostile work environment claims. Likewise, they argue that the plaintiffs' claims do not satisfy Rule 23(b)(3)'s requirements of predominance and superiority.[3]

---

[3] The defendants also make arguments related to Rule 23(b)(2). Rule 23(b)(2) allows a class to be certified for the limited purpose of injunctive relief where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Because, as discussed below, the Court concludes that a Rule 23(b)(3) class should be certified for both damages and injunctive purposes, *see Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, AFL-CIO*, 216 F.3d 577 577, 581 (7th Cir. 2000), the Court need not address the Rule 23(b)(2) arguments.

### 1.    Ascertainability, due process, and standing

Before turning to Rule 23, the Court must first address a challenge to the hostile work environment class definition that does not fit squarely under Rule 23(a) or 23(b). Specifically, the defendants challenge the proposed class definition on the basis that it is not sufficiently ascertainable.  Although not expressly provided for by Rule 23, the Seventh Circuit has recognized that the members of a proposed class must be ascertainable, meaning that the class must be "defined clearly and based on objective criteria." *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659 (7th Cir. 2015).  A clear definition is one that "identif[ies] a particular group, harmed during a particular time frame, in a particular location, in a particular way."  *Id.* at 660.  "[C]lasses that are defined by subjective criteria, such as by a person's state of mind, fail the objectivity requirement." *Id.*

The defendants argue that the hostile work environmental class is not ascertainable for two reasons.  First, they argue that the class's purported inclusion of law clerks "required to visit the jail and/or lockup in connection with their employment" is not ascertainable because law clerks are not and were never required to visit either location.  This argument lacks merit.  That law clerks were purportedly never required to enter lockup does not present a problem of ascertainability because, whether or not that was the case, it is still an objective, readily discernible criterion.  That is, the inclusion of that language does not cause a portion of the class to be unidentifiable.  Rather, assuming the defendants are correct, that portion of the class definition is objectively ascertained to include zero putative plaintiffs.  For that reason, this argument is best understood as a swipe at the merits of those class members' hostile work environment

14

claims. The Court therefore overrules defendants' argument. *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1025 (7th Cir. 2018) ("At this early stage in the litigation, the merits are not on the table.").

Second, the defendants argue that the class is not ascertainable because it purportedly includes assistant public defenders who have not yet but may at some point in the future be required to enter the jail or lockup. Citing *In re Domestic Drywall Antitrust Litigation*, No. 13-MD-2437, 2017 WL 3700999, at *10 (E.D. Pa. Aug. 24, 2017), the defendants contend that this phrasing is too inexact to permit certification. They specifically point to notice problems presented by the proposed class definition— the putative class members who have not yet been, but may at some point be, required to go to the jail or lockup are unidentifiable and thus cannot possibly receive notice.

The defendants' citation is inapposite. The Eastern District of Pennsylvania, where *In re Domestic Drywall* was decided, sits within the Third Circuit. The Seventh Circuit in *Mullins* dedicated much of its careful analysis to distinguishing and expressly declining to adopt the enhanced ascertainability standards endorsed by the Third Circuit. *See Mullins*, 795 F.3d at 657-58, 659-72. The fact that the class defines its membership to include all those who meet certain clear criteria "from November 1, 2015 through the present" undoubtedly satisfies the Seventh Circuit's ascertainability requirement that a class definition must identify "a particular time frame," notwithstanding the defendants' citation to Third Circuit authority to the contrary. *See A.M.T. v. Gargano*, No. 10-cv-0358-JMS-TAB, 2010 WL 4860119, at *4 (S.D. Ind. Nov. 22, 2010) (finding that the membership of a forward-looking class was ascertainable).

The defendants are correct, however, to the extent that they argue that the

15

proposed hostile work environment class presents notice problems. But they are incorrect to describe these notice problems in terms of ascertainability. *See Mullins*, 795 F.3d at 665-66. Rather, as the Court of Appeals explained in *Mullins*, a class definition that includes unidentified or "absent" putative plaintiffs creates due process problems entirely separate from ascertainability that ought to be weighed by a court considering class certification. *See id.* Specifically, the Court must balance the stakes of the litigation (and, relatedly, the importance of the unidentified class members' rights) against the practicability of notice. *See id.*

The Court concludes that certifying the hostile work environment class proposed by the plaintiffs would potentially violate the due process rights of future putative class members and that the definition sweeps somewhat too broadly for certification under Rule 23(b)(3). The Court reaches this conclusion because reasonable notice cannot be provided to the putative class members who "will be required" to visit the jail and/or the lockup as part of their work due to the fact that they are necessarily unidentifiable at this point. *See Mullins*, 795 F.3d at 665-66; *Lemon*, 216 F.3d at 580. The Court will therefore excise that portion of the proposed class definition. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (noting that the district court has authority to refine the class definition to resolve problems of over-inclusiveness).

The Court acknowledges that the plaintiffs alternatively proposed certifying this portion of the class including unidentified future members only under Rule 23(b)(2). That rule permits certification of a class for the limited purpose of injunctive relief and has been read by some courts to permit certification of classes including future

16

members who have not yet been injured in the way common to the class. *See, e.g.*, *Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672, at *1-2 (N.D. Ill. Apr. 28, 2017); *A.M.T.*, 2010 WL 4860119, at *4. And, for their part, the defendants appear to concede that such certification may be permissible for a forward-looking class. Nevertheless, the Court declines to certify the "will be required" portion of the hostile work environment class definition under Rule 23(b)(2). The Court concludes that future members of this putative class may face standing problems unaddressed by the parties. *See, e.g.*, *Mednick v. Precor, Inc.*, No. 14 C 3624, 2016 WL 5390955, at *7-9 (N.D. Ill. Sept. 27, 2016); *Rock v. Nat'l Collegiate Athletic Ass'n*, No. 12-cv-01019-TWP-DKL, 2016 WL 1270087, at *15-16 (S.D. Ind. Mar. 31, 2016). These future class members have not yet been injured, and the plaintiffs have not attempted to show that they face a real and immediate threat of future harm. *See Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2014). The Court thus possesses insufficient information to certify this subset of the class under Rule 23(b)(2). And, the Court notes, certification of this subset of the class under Rule 23(b)(2) probably would make no difference; the injunctive relief sought by the plaintiffs is likely to be the same irrespective of whether or not the future-looking portion of the class definition is retained.

In consideration of due process and standing, but not as a result of the defendants' ascertainability arguments, the Court will modify the hostile work environment class definition to exclude the phrase "or will be required to visit."

## 2. Rule 23(a)

As previously noted, Rule 23(a) requires a plaintiff class to satisfy the requirements of numerosity, typicality, commonality, and adequacy. *See Fed R. Civ. P.*

23(a); *Wal-Mart*, 564 U.S. at 349. Numerosity is undisputed here, presumably because the putative class includes more than 260 assistant public defenders and seventy law clerks. *See Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 860 (7th Cir. 2017) (citing *Newberg on Class Actions* § 3.12 for the proposition that "a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone"). But the defendants challenge plaintiffs' ability to meet each of the other requirements.

### a. Commonality

Rule 23(a)(2) requires a plaintiff seeking class certification to show that there are "questions of law or fact common to the class." The Supreme Court has clarified that commonality requires "not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. For the purposes of this requirement, "[e]ven a single [common] question will do." *Id.* at 359 (alterations in original) (internal quotation marks omitted); *see also Chi. Teachers Union*, 797 F.3d at 434 ("The claims must depend upon a common contention that is capable of class-wide resolution.")

The Court concludes that there are several questions subject to common resolution that satisfy this requirement. The defendants argue, citing *Bolden v. Walsh Construction Co.*, 688 F.3d 893 (7th Cir. 2012), that the fact that members of the putative class worked in different divisions of the Public Defender's office renders their claims unsatisfactory under the commonality requirement. But that citation is unavailing. *Bolden* concerned allegations of discrimination from a class of construction workers who worked on more than 260 different worksites around Chicago. *Id.* at 894-

18

95. Each worksite was led by a superintendent, and each superintendent exercised his discretion differently, though the plaintiffs contended many practiced or permitted racial discrimination. *Id.* The Seventh Circuit concluded that because the discrimination was effected by myriad different independent actors without any apparent common cause, there were no sufficiently important common questions subject to collective resolution. *Id.* at 899. The defendants contend the same rationale applies here to the sixteen different divisions of the Public Defender program and the various different working situations assistant public defenders experience across the Cook County Jail system.

Since *Bolden* was decided, however, the Seventh Circuit has explained that working in different locations and for different supervisors does not automatically defeat commonality for a putative employment discrimination class. In *Chicago Teachers Union*, the court held that where there is a common policy that applies across worksites and channels individual supervisors' discretion in discriminatory ways, that common policy may serve as "the glue that binds the claims together" for purposes of class certification. *Chi. Teachers Union*, 797 F.3d at 436. The plaintiffs here point to evidence, discussed previously, that they contend shows common questions regarding several of the defendants' policies and their effects on the plaintiffs' work environment. These common questions include whether the attacks by inmates were so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; whether the defendants' policies led to the rapid proliferation of masturbation attacks against public defenders and law clerks across the Cook County Jail system; whether the defendants discouraged the plaintiffs from reporting when they were attacked; and whether the defendants' delay in making effective changes to

19

reduce the rate of violence constituted an unreasonable delay in discovering and remedying the situation. Any one of these or several other common questions presented by the plaintiffs will "resolve an issue that is central to the validity of each claim," *id.* at 434, thus satisfying the commonality requirement.

The defendants also seem to argue that the plaintiffs' hostile work environment claims are a poor fit for class treatment because they involve both objective and subjective elements. *See Johnson*, 892 F.3d at 900. But, contrary to the defendants' contention, judges in this district, including the undersigned judge, have certified hostile work environment classes despite the fact that these claims include a subjective element. *See, e.g.*, *Brand v. Comcast Corp.*, 302 F.R.D. 201, 221-22 (N.D. Ill. 2014) (Kennelly, J.); *Brown v. Yellow Transp., Inc.*, No. 08 C 5908, 2011 WL 1838741, at *5-7 (N.D. Ill. May 11, 2011); *Smith v. Nike Retail Servs.*, 234 F.R.D. 648, 660-61 (N.D. Ill. 2006). In any event, this is an argument better suited to a challenge of predominance or perhaps typicality. As the Court has already noted, there is certainly more than one important issue subject to common resolution presented by the plaintiffs' claims, and the claims therefore satisfy Rule 23(a)(2)'s commonality requirement.

### b. Typicality

The defendants next argue that the plaintiffs' claims are insufficiently typical for class certification. A class representative's claims are typical of the proposed class if they "arise[ ] from the same event or practice or course of conduct that gives rise to claims of the other class members and [are] based on the same legal theory." *Lacy v. Cook County*, 897 F.3d 847, 866 (7th Cir. 2018); *see also Beaton*, 907 F.3d at 1026. The defendants' typicality arguments are closely related to those they made regarding

commonality.  That is perhaps unsurprising given that "commonality and typicality 'tend to merge.'"  *See Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).

Specifically, the defendants point to the plaintiffs' masturbation attack report data, which suggest that most of the attacks occurred in divisions 9 and 10 and the Leighton Courthouse lockups.  They take issue with the plaintiffs' proposal to certify a class that includes women who worked as assistant public defenders and law clerks in outlying courthouses and for divisions of the office that have no regular contact with detained people, such as those who work with juvenile offenders.  The defendants argue that because all but one of the named plaintiffs worked in the Felony Trial Division at the Leighton Courthouse—the exception being Willis, who worked at the Markham Courthouse—their claims are atypical of the plaintiff class.  Relying primarily on case law from the Sixth Circuit, the defendants argue that even if the class representatives are able to prove their own claims, they will not be able to prove those of other class members.

But typicality does not require perfect identity of claims.  *See Beaton*, 907 F.3d at 1026 (noting that claims "may feature some factual variations as long as they have the same essential characteristics" (internal quotation marks omitted)).  Here, the plaintiffs' claims all share the same essential characteristics:  they each allege that they were subject to a hostile work environment as a result of the defendants' policies, which they say exacerbated—or at least failed to address—masturbation attacks by detainees against female assistant public defenders and law clerks.  The also all contend that the defendants were aware of the problem, acknowledged that it was widespread across

the Cook County Jail system, and failed to enact reasonable and effective changes to resolve it. The plaintiffs freely admit that some class members likely experience *more* of the attacks—particularly those who worked in divisions 9 and 10 and the Leighton Courthouse. But they also contend (and the defendants do not meaningfully contest) that attacks took place throughout the county, albeit at a significantly lower rate outside the jail complex. And, they contend, even those assistant public defenders who worked elsewhere had to spend time working with the Felony Trial Division at the Leighton Courthouse to be eligible for promotions. As a result, the plaintiffs argue, any differences in the frequency and severity of attacks experienced by any two class members are differences in degree, and not kind, that may properly be addressed at a later stage. *Cf. Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (noting that that minor differences regarding remedies typically do not preclude class certification).

The Court is satisfied that the named plaintiffs' claims are sufficiently typical to support certification. Although there will no doubt be some factual variation between the claims of an assistant public defender who worked in the Felony Trial Division and one who worked in, for instance, the juvenile civil division, both have alleged a common injury: employment discrimination caused by the plaintiffs' policies that allegedly created a hostile work environment. That some of the plaintiff class members may have experienced masturbation attacks with less frequency does not mean they were uninjured by the hostile work environment those attacks created. Rather, they may have simply been injured to a lesser extent—an issue better suited for resolution at a

22

later stage of the litigation.  In sum, the Court finds that the putative class's claims satisfy the typicality requirement of Rule 23(a)(3).

### c.    Adequacy

To satisfy the adequacy requirement, the plaintiffs must demonstrate both that the named plaintiffs are satisfactory representatives for the class and that their counsel are up to the task of prosecuting the action.  *See Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011).  The defendants do not contest adequacy of counsel. Although adequacy overlaps somewhat with commonality and typicality, it also requires analysis of whether there are conflicts of interest between the class representatives and potential members of the class.  *See Wal-Mart*, 564 U.S. at 349 n.5.  Because the Court already addressed the portions of the defendants' argument that overlap with commonality and typicality, the Court focuses here on the latter point.

The defendants make two primary arguments to support their contention that the named plaintiffs are inadequate representatives of the class.  First, they say that because some of the law clerk class members accompanied male assistant public defenders into lockups, they did not suffer injuries and are thus not adequately represented by the named plaintiffs, each of whom alleges significant harm.  That is, the defendants appear to suggest that the presence of a male public defender in lockup inoculated law clerks from attack by detainees, rendering those women immune from harm.  This contention is contrary to the weight of the evidence.  Specifically, there is significant evidence that the detainees who perpetrated these attacks had no reservations about exposing themselves in front of other men; indeed, there is substantial testimony suggesting that some of the attackers participated in group

23

attacks in concert with other male detainees. And the plaintiffs to evidence of at least

one attack on a female law clerk who was assigned to accompany a male public

defender. The Court is therefore unpersuaded that the fact that some law clerks were

assigned to work with male public defenders automatically protected them from attack,

rendering their claims so different from those of the proposed representatives that it

defeats adequacy of representation.

The Court is more concerned, however, with a different adequacy problem

mentioned only in passing by the defendants. Specifically, the defendants point out that

none of the class representatives identified in the plaintiffs' filings served *only* as a law

clerk. The implication is that because all of the representatives are assistant public

defenders, they may have incentives—particularly during settlement negotiations—to

sell short the claims of the law clerk class members. The plaintiffs, for their part, argue

that there is no adequacy problem. They point out that one of the proposed

representatives, Samantha Slonim, served as a law clerk before she became an

assistant public defender and suffered an attack during her clerkship. And they cite

*Smith v. Nike Retail Services*, 234 F.R.D. at 661, for the proposition that a class

representative can adequately represent individuals who served in formally different

roles as long as they share an overriding common interest. *See id.* ("Here the strength

of the common injury and the interest shared by the named plaintiffs and class

members—the harm caused by an allegedly hostile work environment and the interest

in eliminating that environment—plainly overrides any potential conflicts.").

Although this is a close question, the Court concludes that the named plaintiffs

are adequate representatives for the law clerks' claims. Specifically, the Court

concludes that the potential conflicts insinuated—and not even fully argued—by the defendants are too speculative to defeat adequacy. *See Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 813 (7th Cir. 2013) ("[T]his court has never held . . . that the mere possibility that a trivial level of intra-class conflict may materialize as the litigation progresses forecloses class certification entirely."). As with any finding at class certification, however, the Court reserves the right to revisit this issue if necessary later in the litigation. *See Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 680 (7th Cir. 2009) ("At this stage in the litigation, the existence of such conflicts is hypothetical. If and when they become real, the district court can certify subclasses with separate representation of each . . . .").

In sum, the Court finds the proposed representatives to be adequate under Rule 23(a)(4).

### 3. Rule 23(b)(3)

Rule 23(b)(3) allows a class action for damages or other relief to be maintained only if "questions of law or fact common to class members predominate over any questions affecting only individual members, and [ ] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3); *see also Amchem*, 521 U.S. at 594.

### a. Predominance

The defendants argue that the proposed class cannot satisfy the predominance requirement. "There is no mathematical or mechanical test for evaluating predominance," but it is more a demanding requirement than commonality or typicality. *Messner*, 669 F.3d at 814. "The guiding principle behind predominance is whether the

proposed class's claims arise from a common nucleus of operative facts and issues."
*Beaton*, 907 F.3d at 1029. In making this assessment, the Court must do "more than a tally of common questions; [it] must consider their relative importance." *Id.* The mere fact that not every issue is "amenable to common resolution" does not defeat predominance, even if "individual inquiries may be required after the class phase" on discrete issues like damages. *Id.*; *see also Amgen*, 568 U.S. at 469 ("Rule 23(b)(3), however, does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." (internal quotation marks and alterations omitted)). "Common issues of fact and law predominate in particular when adjudication of questions of liability common to the class will achieve economies of time and expense." *Chi. Teachers Union*, 797 F.3d at 444.

The defendants contend that individualized questions predominate over those common to the plaintiffs' claims. In support of this position, they lean heavily on two cases from district courts outside the Seventh Circuit that involved putative hostile work environment classes of female prison employees. *See Berndt v. Cal. Dep't of Corr.*, No. C 03-3175 PJH, 2012 WL 950625 (N.D. Cal. Mar. 20, 2012); *Rudolph v. Dep't of Corr.*, No. 5:06cv56-RS (N.D. Fla. Nov. 9, 2006). In both cases, district courts found putative classes that included large numbers of employees spread across entire states' correctional systems to be overbroad and to lack predominance. And no wonder; each sought to certify classes of women who worked in various prisons across an entire state's correctional system—California for *Berndt* and Florida for *Rudolph*. The judges emphasized the literal and metaphorical distance among the plaintiff class members' claims and concluded that, given the overbreadth of the class definitions, certification

26

under Rule 23(b)(3) was impossible.  And, in *Berndt*, the district court also emphasized that the plaintiff class sought certification of a class with a definition spanning all the way back to 1989, "rais[ing] the obvious question whether certain of the putative class members' claims are time-barred."  *Berndt*, 2012 WL 950625, at *8.

Berndt* and *Rudolph* are readily distinguishable.  Both cases concerned putative classes far broader than the one proposed here in terms of time, physical scope, and size.  Moreover, both cases involved the sort of concerns addressed by the Seventh Circuit in *Bolden*, 688 F.3d at 898, wherein individual decisionmakers—in *Bolden*, worksite superintendents, and in *Rudolph* and *Berndt*, prison wardens—exercised largely unfettered discretion to regulate the various wok environments experienced by the many different putative class members.  Here, on the other hand, the plaintiffs have persuasively demonstrated that a common policy or set of policies adopted by the defendants created or permitted an allegedly hostile work environment.  Moreover, to the extent that *Berndt* and *Rudolph* could be read to suggest that hostile work environment claims can never be certifiable under Rule 23(b)(3), that conclusion is not binding and is contrary to the weight of authority in this district.  *See, e.g.*, *Brand*, 302 F.R.D. at 224; *Brown*, 2011 WL 1838741, at *5-7; *Smith*, 234 F.R.D. at 661, 666.

The Court concludes that the plaintiffs have established that significant common questions predominate.  Turning to "the elements of the underlying cause of action," *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011), the Court notes that nearly all are subject to common resolution.  To establish liability on their Title VII claims, the plaintiffs "must show that (1) [they were] subject to unwelcome harassment; (2) the harassment was based on [their sex]; (3) the harassment was so severe or

pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." *Johnson*, 892 F.3d at 900. And for the constitutional claims, the plaintiffs must additionally demonstrate that the defendants acted or failed to act under color of law. *Alamo*, 864 F.3d at 548 n.16; *Am. Mfrs. Mut. Ins.*, 526 U.S. at 49.

All but one of these elements is readily susceptible to collective resolution. First, the plaintiffs allege that detainees formed a prison gang called "Savage Life" with the primary aim of organizing masturbation attacks on women who worked in the prison. Proof of this allegation will easily satisfy the second element. Likewise, the objective severity of the harassment underlying the hostile work environment allegations is subject to resolution in a single proceeding. The same is true of employer liability; the record before the Court confirms that the plaintiffs' claims that the defendants' efforts to address the masturbation attacks were delayed and ineffective to the point of negligence (or worse) will rise or fall as one. The additional element that the plaintiffs must prove to succeed on their section 1983 claims against Dart and Campanelli in their official capacities—that the defendants were acting under color of law when they devised and enacted (or failed to enact) policies with respect to the widespread sexual harassment—will surely also be susceptible to collective resolution. And the Court is satisfied that the subjective element of the hostile work environment claim will neither predominate nor be particularly complicated for each individual plaintiff to prove. *See Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004) (noting that the subjective element could be proven through evidence of objections or complaints to supervisors). The subjective element may therefore readily be addressed as part of

later proceedings, and it does not undermine predominance. *See Beaton*, 907 F.3d at 1029 (noting that "not every issue must be amenable to common resolution" to satisfy predominance, and that "individual inquiries may be required after the class phase"); *Chi. Teachers Union*, 797 F.3d at 444 (same).

The defendants' contentions regarding the objective element of the hostile work environment claim—which they raised only with respect to commonality under Rule 23(a) but which also fit here—require a bit more discussion. The defendants argue that because the available data suggest that the masturbation attacks underlying the hostile work environment claim were largely concentrated at the Leighton Courthouse and divisions 9 and 10, and because many of the putative class members worked elsewhere, the objective element of the hostile work environment claim cannot be resolved collectively. In other words, they argue that the members of the putative class who worked outside of the Leighton Courthouse or these particular divisions of the jail had a different work environment. The plaintiffs, for their part, counter that the defendants themselves acknowledged that these attacks are widespread across the county and that many attacks go unreported, meaning that data are badly incomplete. And even those assistant public defenders who work primarily outside the Leighton Courthouse and problem divisions have to spend time there working with the Felony Trial Division in order to be eligible for promotions. They therefore have been subject to the hostile work environment created by the widespread sexual harassment, albeit to a lesser degree than their colleagues who are assigned fulltime to the Felony Trial Division.

The plaintiffs have the better of this argument. The fact that some members of

the plaintiff class did not work every day at the Leighton Courthouse or in the divisions

of the jail most severely impacted by what Campanelli described as an "epidemic" of

masturbation attacks does not mean that they were uninjured by the alleged hostile

work environment the attacks created.  The defendants do not contest that assistant

public defenders who work in other divisions of the public defender program or outlying

courthouses must come to the Cook County Jail for some portion of their work.  Nor do

they address the plaintiffs' argument that, due to a culture of silence and retribution

against reporting, available data are not a precise measure of how many attacks have

occurred or where they happened.  Moreover, even if the defendants could conclusively

show that some of the putative class members had never themselves never been

targeted by a masturbation attack, they have not even attempted to argue that those

individuals did not experience an objectively hostile work environment as a product of

knowing that such attacks were common.  It is true, of course, that hearing about

discriminatory behavior secondhand is weaker evidence of a hostile work environment

than an account of firsthand exposure.  *See Johnson*, 892 F.3d at 902.  But even

secondhand accounts are relevant, and they may, in some cases, be independently

actionable.  *See id.* (describing relevance); *Dandy v. United Parcel Serv., Inc.*, 388 F.3d

263, 272 (7th Cir. 2004) ("Repeated use of [racial epithets] in the work environment

(especially considering the fact that [they] are meant to denigrate a group of people)

may create an objectively hostile work environment, even if they are heard

secondhand.").  In light of these considerations, the Court is satisfied that the objective

element of the plaintiffs' hostile work environment claim is subject to common resolution.

Finally, Dart also makes two additional arguments regarding predominance that

merit discussion. First, he contends that the plaintiffs' claims against him will require individualized inquiries into whether each individual plaintiff was a joint employee of the sheriff's office as well as the Public Defender under a five-factor test set out in *Knight v. United Farm Bureau Mutual Insurance Co.* 950 F.2d 377, 378-79 (7th Cir. 1991).[4] Without citation, Dart then argues that the plaintiffs' joint employer arguments diverge substantially from one another. The plaintiffs counter that the sheriff's office has a joint employer relationship with all assistant public defenders due to its close connections to the Public Defender and to Cook County and its control over a significant portion of the public defenders' work environment. They specifically point to Illinois statutes that they contend define some of the contours of this relationship.

The Court concludes, without reaching the merits, that the issue of joint liability does not defeat predominance because it appears plaintiffs' contention regarding joint employment by Dart is amenable to collective resolution. In his argument to the contrary, Dart points only to individual class members' testimony during depositions that they did not work for the sheriff. But he does not explain why that testimony ought to be read to suggest the five factors from *Knight* are not susceptible to collective resolution. Indeed, it appears that at least four of the five factors concern issues related to the assistant public defender and law clerk job descriptions and are thus subject to common proof for all assistant public defenders and for all law clerks.

Dart's other argument involves only the plaintiffs' section 1983 claim. He argues

---

[4] The five factors are (1) the extent of the employer's control and supervision over the employee; (2) the kind of occupation and nature of skill required, including whether skills were acquired on the job; (3) the employer's responsibility for the costs of operation; (4) the method and form of payment and benefits; and (5) the length of the job commitment. *See id.*; *see also Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 702 (7th Cir. 2015).

that the plaintiffs will be unable to prove that the his office acted with intent to discriminate against female assistant public defenders.  But, as the plaintiff correctly note, the issue here is not actually one of predominance but rather goes to the merits and is therefore premature.  *See Beaton*, 907 F.3d at 1025.  The plaintiffs allege that the sheriff's office's actions and deliberate inaction in policymaking caused the hostile work environment.  Irrespective of whether they are likely to prevail on the merits, the issue of Dart's intent is undoubtedly common question subject to collective resolution. *See Chi. Teachers Union*, 797 F.3d at 444 ("Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." (quoting *Amgen*, 568 U.S. at 459)).

For these reasons, the Court finds that the hostile work environment class satisfies the predominance requirement of Rule 23(b)(3).

### b.    Superiority

Rule 23(b)(3)'s second requirement asks whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This requirement "is comparative:  the court must assess efficiency with an eye toward other available methods."  *Mullins*, 795 F.3d at 664 (internal quotation marks omitted).  The rule identifies four factors that may be relevant to the superiority analysis:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  This analysis is correlated with that of predominance; the

Seventh Circuit has noted that "the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." *Messner*, 669 F.3d at 514 n.5 (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1269 (11th Cir. 2004)).

Here, the defendants' arguments largely fold into those already discussed and rejected. They assert without much analysis that the putative class's claims would be unmanageable because they would require "mini-trials" to determine whether each member of the putative class was actually injured by what one of the defendants has described as an "epidemic" of masturbation attacks across the Cook County Jail system. The plaintiffs, on the other hand, remind the Court that the attacks were allegedly permitted and even exacerbated by the defendants' policies and that it was not until this Court entered its preliminary injunction that the defendants began to get a handle on the situation.

Ultimately, the Court concludes that a class action is far superior to sending the hundreds of members of this putative class to file individual lawsuits against the defendants. *See Mullins*, 795 F.3d at 664 (noting the comparative focus of the analysis). As discussed at length above, there are myriad common questions subject to common resolution in this dispute, and those issues far and away predominate over individualized inquiries that may arise. The collective resolution of these claims will "achieve economies of time, effort, and expense," and the claims are therefore well-suited for class treatment. *See Amchem*, 521 U.S. at 615.

**B.    Retaliation subclass**

The plaintiffs also seek certification of a subclass for their retaliation claims

against Campanelli. Specifically, they allege that Campanelli adopted the October 2017 lockup ban in retaliation against members of the plaintiff class filing an EEOC charge and making other complaints. To prevail on a retaliation claim, the plaintiffs must "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010).

Except for a perfunctory assertion that this subclass "shares the same problems as the hostile work environment class," the defendants do not contest that it satisfies Rule 23(b)(3). Indeed, Campanelli's objections to the subclass definition are refreshingly focused. First, she argues that the plaintiffs' amended complaint alleges retaliation only in the form of the lockup ban. Therefore, she contends, the proposed subclass definition should be limited to assistant public defenders who worked at the Leighton Courthouse during the twenty-three days in October 2017 during which the ban was in effect. Second, Campanelli argues that the amended complaint identifies only the EEOC charge as relevant protected behavior and not other forms of complaints or charges. She contends that because only seventeen of the plaintiffs jointly filed the EEOC charge, the subclass should be limited to those seventeen plaintiffs. After adjusting the class definition to reflect the appropriate number of putative subclass members, Campanelli argues, the retaliation subclass is insufficiently numerous to satisfy Rule 23(a)(1).

The plaintiffs disagree with Campanelli's reading. They argue that they properly alleged a broader theory of retaliation in their first amended complaint and that the subclass should therefore be permitted to pursue claims on behalf of all female

34

assistant public defenders who, during the class period, filed charges or reported or made complaints about detainee masturbation or indecent exposure incidents, including but not limited to the EEOC charge.

Each party is partly correct. Campanelli is right that the only form of retaliation alleged in the complaint and meaningfully argued in the plaintiffs' briefs is the Leighton Courthouse lockup ban. The proposed class must therefore be narrowed accordingly, as explained below. But so too are the plaintiffs right that the protected activities alleged in their complaint are not limited to the EEOC charge. Rather, the amended complaint asserts that Campanelli "retaliated against [the p]laintiffs for having engaged in protected activity . . . *including* their opposition to the hostile sexually offensive discrimination and their filing of charges of discrimination with the EEOC." First Am. Compl., dkt. no. 81, ¶ 158 (emphasis added). The Seventh Circuit has made clear that taking "some step in opposition to a form of discrimination that the statute prohibits," such as filing a charge or making a complaint about a hostile work environment, is a protected activity within the meaning of Title VII. *See Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017). It is therefore inappropriate to give the amended complaint's language the narrow reading Campanelli suggests.

Accordingly, the Court finds that the retaliation subclass *may* be certifiable, but with (1) a far narrower time limitation and (2) clarification, and perhaps modification, of the requirement that putative members made some sort of complaint to which retaliation may have been causally connected. Specifically, the Court will adopt the plaintiffs' proposed definition to the extent that it identifies protected activities beyond the EEOC charge—i.e., filing criminal charges or making complaints. The Court will narrow the

35

proposed definition, however, to include only assistant public defenders for whom there is a record of such protected activities.  The definition proposed by the plaintiffs would permit assistant public defenders to opt in simply by averring that they had at some point complained (or perhaps even thought to complain) about the attacks, and that result like would raise ascertainability problems for lack of "objective criteria" defining membership.  *See Mullins*, 795 F.3d at 659 (holding that classes must "be defined clearly and based on objective criteria").

Moreover, instead of capturing all female assistant public defenders who worked in the Felony Trial Division between November 1, 2015 and the present, the subclass can properly include only those who worked in the Felony Trial Division from October 31, 2017 to November 22, 2017—the period during which the allegedly retaliatory policy was in effect—and who engaged in protected activities as defined above before October 31.  This limitation is perhaps best understood as an adjustment to satisfy Rule 23's strictures of commonality, typicality, and predominance.  *See Messner*, 669 F.3d at 825 (noting that district courts have authority to refine the class definition to resolve problems of over-inclusiveness).  The plaintiffs have not explained or attempted to explain how assistant public defenders who were not working in the Felony Trial Division during the ban could have experienced it as retaliation—an issue that the Court alluded to in its order denying the defendants' motions to dismiss.  *See Brown v. Cook County*, No. 17 C. 8085, 2018 WL 3122174, at *10 (N.D. Ill. June 26, 2018) (declining to dismiss the retaliation claims because the lock up ban could satisfy the controlling definition of an "adverse employment action" for purposes of Title VII retaliation).  *See generally Robinson v. Perales*, 894 F.3d 818, 830 (7th Cir. 2018) (describing the

definition of adverse employment action).

Although the Court concludes that certification of the subclass may be appropriate, it declines to grant certification at this time. The record contains insufficient information from which to assess whether the subclass satisfies Rule 23(a)'s numerosity requirement after these necessary adjustments are made. Rule 23(a)(1) permits certification only where the class is so numerous that joinder is impracticable. As previously noted, that rule is commonly presumed to be satisfied where the proposed class includes more than forty members. *See Mulvania*, 850 F.3d at 860 (citing *Newberg on Class Actions* § 3.12).[5] Before the adjustments made here, there were purportedly forty-seven putative subclass members. But there is no basis in the record by which the Court can assess whether the narrower retaliation class definition approved by the Court will reduce the size of the subclass to an extent that numerosity under Rule 23(a)(1) is lacking. The Court therefore declines to certify the proposed subclass unless and until such evidence is provided.

## C. Evidentiary dispute

The parties also make passing arguments about the admissibility of an expert report. The defendants argue that the plaintiffs' citations to a report by Jeanne S. Woodford should be stricken or disregarded because she was not appropriately disclosed as a witness in this case. They note that Woodford was disclosed as an expert in a related case before this Court, *Howard v. Cook County Sheriff's Office*, No.

---

[5] This does not necessarily mean that forty is the lower legal limit to satisfy the numerosity requirement. The Court references *Mulvania* here just to make it clear that the proposed retaliation subclass was close to the low end of the scale at which a class is *presumed* sufficiently numerous.

17 C 8146 (N.D. Ill.), and suggest that the plaintiffs may be attempting to skirt the rules by getting the expert testimony into this case through a side door. The plaintiffs do not contest that they failed to disclose Woodford. They instead argue that the defendants had enough opportunity to challenge Woodford's testimony in the *Howard* case to ameliorate any resulting prejudice.

The plaintiffs' arguments are unconvincing. Rule 26(a)(2)(B) states unequivocally that an expert must be disclosed when her expert report is offered. The Court is persuaded by the reasoning from *Stock v. Integrated Health Plan, Inc.*, No. 06-CV-00215-DRH, 2007 WL 2304055, at *1 (S.D. Ill. Aug. 10, 2007), that permitting a party to smuggle an expert report in to support a motion for class certification without the expert witness being disclosed simply because the expert's report was first offered in a different case would confound the spirit of Rule 26(a)(2)(B). The Court has therefore disregarded all references to Woodford's report in deciding the motion for class certification and notes that the plaintiffs cited Woodford's report only for purposes for which they also cited other evidence.

**D.    Class counsel**

Finally, the Court must appoint class counsel. *See* Fed. R. Civ. P. 23(g). After reviewing the factors set forth in Rule 23(g), the Court is satisfied that Robin Potter and M. Nieves Bolaños of Potter Bolaños LLC meet each of the criteria required. They have so far faithfully and zealously prosecuted the plaintiffs' claims and are knowledgeable of and experienced with the applicable law. The Court is also satisfied that counsel will dedicate sufficient resources to representing the class. The Court therefore appoints Potter and Bolaños as class counsel.

38

**Conclusion**

For the foregoing reasons, the Court grants the plaintiffs' motion for class certification in part and denies it in part [dkt. no. 190]. The Court certifies the following hostile work environment class: All female assistant public defenders (not including supervisors) and law clerks who have worked for the defendants from November 1, 2015 through the present and who have visited the jail and/or lockup in connection with their employment. The Court appoints Robin Potter and M. Nieves Bolaños as class counsel. The Court declines, however, to certify the retaliation subclass unless the plaintiffs demonstrate that it is sufficiently numerous to satisfy Rule 23(a)(1) after the modifications to the subclass definition described above. The case is set for a status hearing on August 20, 2019 at 9:30 a.m. to set any necessary schedules for further proceedings as well as a date for the next settlement conference.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 12, 2019